UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

CENTRAL DIVISION

FILED
APR 2 2 2005

*******************************************************************************

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR. 05-30011 |
| Plaintiff, | |
| -vs- | REPORT AND RECOMMENDATIONS FOR DISPOSITION OF DEFENDANT'S MOTION TO SUPPRESS |
| ALAN KENNETH TALKS, | |
| Defendant. | |

*******************************************************************************

In an issue of first impression, Kenneth Alan Talks (Talks), an Indian, seeks to suppress the statements and evidence obtained following his stop and detention, by a county sheriff, on the Cheyenne River Indian Reservation, and subsequent arrest by a tribal officer for an assault offense that was committed against another Indian on the Reservation. Talks claims that he was illegally arrested by the sheriff, in violation of the Fourth Amendment to the United States Constitution and that under that Amendment's exclusionary rule, the statements he made to the sheriff and to tribal officers and the evidence taken from him and seized from his vehicle should all be suppressed as "fruit of the poisonous tree." The Government maintains that Talks' arrest was lawful and that the statements and evidence flowing therefrom are admissible at trial.

I.

The relevant facts are set forth in some detail in order to provide the necessary backdrop for the primary issue to be decided, namely, whether Talks was subject to an extra jurisdictional arrest that was constitutionally proscribed. Resolution of this issue, like in

most cases, depends on the factual nuances present, and this case is certainly no exception.

At approximately 1:45 p.m. on January 3, 2005, Robert Menzel, the Ziebach County Sheriff, met with Ted Marrowbone at the former's office in Dupree, South Dakota. Marrowbone was in to report a disturbance at his residence, located just west of Dupree and within the exterior boundaries of the Cheyenne River Indian Reservation, that he claimed was caused by Talks. Because the incident involved an Indian at a location on the Reservation, Menzel called the Cheyenne River Tribal Police Department and advised the dispatcher of what Marrowbone had reported. Menzel then heard on his police radio that a tribal officer was in route to the Marrowbone residence to investigate. Subsequently, Menzel was contacted by Sergeant Russell Leaf, a tribal police officer. Leaf indicated that Talks had assaulted Connie Bird Necklace at Marrowbone's home and had left in a blue Buick Regal. Leaf asked Menzel to be on the look out for Talks and to stop and detain him and to call Leaf if Talks was located.

About 3:30 that afternoon, Menzel drove from his office to Talks' residence, about four or five blocks away, and saw a blue Buick that matched the description provided by Leaf. The vehicle was parked in the driveway to the residence. As Menzel approached the front door to the residence, he could hear the door being locked, but knocked anyway. When nobody came to the door, he left and went back to his patrol car. In the process, Menzel noticed that the driver's side window of the Buick was broken and that there was an iron bar laying in the back seat of the vehicle. Menzel then tried to call Leaf, who was not available. Minutes later, Leaf called Menzel, who by that time was parked in his car about a half a block north of Talks' residence. During the phone conversation, Leaf informed Menzel that

Bird Necklace had been assaulted with a "jack" (an iron bar) – like the one that Menzel had seen laying in back of the Buick – and that Leaf wanted Talks detained. Leaf, however, said that he was at the Indian Health Service (IHS) Hospital in Eagle Butte and that he would meet Menzel if Talks was found.

About 4:00 p.m., Menzel observed Talks walking on the sidewalk toward the blue Buick. Menzel then pulled into the driveway of the residence whereupon Talks reversed direction and began walking toward the residence. Menzel quickly got out of his car, caught up with Talks and called to him by name. Talks did not flee or go into the residence, but rather stopped and cooperated with Menzel. As he escorted Talks to the patrol car, Menzel asked Talks what was going on. Talks said that someone had broken the window out of his car. Menzel then asked if Talks knew where Bird Necklace was at, to which Talks stated he did not know. At that time, Menzel advised Talks that the tribal police wanted to talk to him and that Menzel was detaining Talks for tribal authorities. At no time did Menzel ever say that Talks was under arrest. Talks was, however, handcuffed, placed in the rear seat of Menzel's patrol car and was not "free to leave." Prior to his departure from the residence, Menzel removed a gray iron bar out of the rear seat of the Buick and placed it in the front passenger seat of the patrol car.

After doing this, Menzel contacted Leaf, explained what had transpired and the two agreed to meet at a designated location, approximately 10 miles from Dupree. There, Leaf took custody of Talks, advised him he was under arrest and Mirandized him. Talks waived his rights and agreed to talk to Leaf, but Leaf did not question him because Talks smelled of alcohol. Leaf subsequently transported Talks to the tribal jail in Eagle Butte where Talks

was administered a portable breath test (PBT) which showed that he had been drinking. Leaf then left Talks with jail staff and did not attempt to interview him that evening.

The next morning, Sonny Garreau, a tribal detective, interviewed Talks at the jail. Before doing so, Talks was advised of his Miranda rights, waived those rights, agreed to speak with Garreau and thereafter made incriminatory statements to him.

II.

For the most part, in the absence of special arrangements or agreements, the power to police and arrest follows the criminal jurisdiction of the law enforcement authority involved. For example, tribal police enforce tribal laws against Indians and have the tribal authority of exclusion over non-Indians. United States v. Wheeler, 435 U.S. 313, 322 (1978); United States v. Terry, 400 F.3d 575, 579-80 (8th Cir. 2005). That power has been held to allow tribal police to investigate a crime committed by a non-Indian, and to turn both the results and the offender over to state authorities. Terry, 400 F.3d at 578-80; State v. Haskins, 269 Mont. 202, 210-13, 887 P.2d 1189, 1194-96 (1994). By contrast, state police or county sheriffs and similar state personnel have authority to arrest non-Indians committing crimes against non-Indians or victimless crimes, but have no jurisdiction over Indians with respect to crimes committed in Indian country. State v. Cummings, 2004 SD 56, ¶18, 679 N.W.2d 484, 489, cert. denied, 125 S.Ct. 355 (2004); State v Spotted Horse, 462 N.W.2d 463, 467 (S.D. 1990), cert. denied, 500 U.S. 928 (1991); see also City of Farmington v. Benally, 119 N.M. 496, 497-98, 892 P.2d 629, 630-31 (N.M. Ct. App. 1995).

Courts in some cases have upheld arrests by state officers of Indians in Indian country for off-reservation crimes. See e.g., State Lupe, 181 Ariz. 211, 213-14, 889 P.2d 4, 6-7

4

(Ariz. Ct. App. 1994); State ex rel Old Elk v. District Court, 170 Mont. 208, 211-13, 552 P.2d 1394, 1396, appeal dismissed, 429 U.S. 1030 (1976). Courts have also permitted arrests of Indians by state officers when the offense was committed out of Indian country, but was based on fresh pursuit. See e.g., United States v. Patch, 114 F.3d 131, 134 (9th Cir.), cert denied, 522 U.S. 983 (1997); City of Cut Bank v. Bird, 307 Mont. 460, 463-64, 38 P.3d 804, 806-7 (2001); but see Cummings, 2004 SD 56, ¶18, 679 N.W.2d at 489.

Nevertheless, for crimes committed within Indian country, the power to arrest there is still determined by the Indian or non-Indian status of the offender and victim. The difficulties caused by this jurisdictional division are obvious and are brought to the forefront in this case. Applying the general rule would seem to indicate that an Indian could not be arrested by a county sheriff for criminal activity that occurred on the reservation. But what if the sheriff simply stopped and detained the Indian offender on the reservation, at the direction of a tribal officer, and then shortly after doing so, turned the offender over to the officer?

The flip side of this very question was just recently addressed by the Eighth Circuit in Terry. There, the defendant, a non-Indian, was "arrested" by tribal police officers and thereafter detained overnight in the Pine Ridge Tribal Jail at the direction of the Shannon County sheriff. 400 F.3d at 578-80. The appeals court held that tribal police officers did not act in excess of their authority and affirmed the district court's[1] denial of the defendant's motion to suppress. Id. In doing so, the court found it significant that the defendant was

---

[1] The Honorable Karen E. Schreier, United States District Judge, for the District of South Dakota.

detained "pursuant to the express instructions and authority" of the sheriff. Id. at 580. Furthermore, the court did not believe that the defendant was held for an unreasonable amount of time given the circumstances present (the sheriff was 80 miles away on a rainy night and his only deputy was unavailable). Id.

While Terry dealt with the detention of a non-Indian by tribal officers and the instant case involves the detention of an Indian by a county sheriff, this Court nonetheless believes that the reasons articulated by the Terry court for upholding the detention apply with equal force here. Just as in Terry, Menzel stopped and detained Talks after being told and given the authority to do so by Leaf. And, Talks' brief detention was not unreasonable given the shortage of tribal officers on duty at the time and Leaf's activities at both the crime scene and the hospital that day.

Furthermore, under the "fellow officer" rule, Menzel was entitled to rely on the communication through police channels directing him to stop and detain Talks. See Whiteley v. Warden, 401 U.S. 560 (1971). Clearly, Leaf had the requisite reasonable suspicion and probable cause to believe that Talks had committed an assault offense in Indian country and communicated this information to Menzel. When he stopped and apprehended Talks, Menzel was simply acting as Leaf's "extension" or "agent" and carrying out the latter's directives. United States v. Celio, 945 F.2d 180, 183-84 (7th Cir. 1991); United States v. Ukoha, 7 F.Supp.2d 913, 917-19 (E.D. Mich. 1998).

It is the existence of tribal consent and a stop and hold directive that distinguishes this case from Cummings and Spotted Horse. In Cummings, the South Dakota supreme court noted that the deputy sheriff failed to request permission from tribal authorities to enter the

6

reservation or otherwise obtain "tribal consent" before arresting the defendant. 2004 SD 56, ¶¶4, 18, 679 N.W.2d at 485, 489. Similarly, in Spotted Horse, the supreme court observed that the city police officer "did not follow proper procedures" because "he transported [the defendant] back to Walworth County for trial rather than turn him over to tribal authorities." 462 U.S. at 469. Here, as soon as Menzel became aware that a potential Indian on Indian crime had been committed on the reservation, he notified tribal law enforcement. He then was instructed by Leaf to stop and detain Talks. Menzel followed these instructions and turned Talks over to Leaf without unnecessary delay. The Court can find nothing wrong with this procedure and believes that the same is consistent with both federal and state precedent and comports with constitutional strictures. Terry, 400 F.3d at 579-80 (upholding the "arrest", detention and turn over procedure of a non-Indian that was utilized by tribal police officers at the behest of a county sheriff); Spotted Horse, 462 N.W.2d at 469 (indicating that the "proper procedure" is for a state officer to turn over an Indian, who is arrested in Indian country, to tribal authorities rather than transport the arrestee to a county jail), see also Strate v. A-1 Contractors, 520 U.S. 438, 456, n.11 (1997) ("We do not question the authority of tribal police to patrol roads within a reservation, including rights-of-way made part of a state highway, and to detain and turn over to state officers nonmembers stopped on the highway for conduct violating state law."); Duro v. Reina, , 495 U.S. 676, 697 (1990) ("Where jurisdiction to try and punish an offender rests outside the tribe, tribal officers may exercise their power to detain the offender and transport him to the proper authorities."); State v. Schmuck, 121 Wash.2d 373, 387, 850 P.2d 1332, 1339 (1993) ("a tribe's proper response to

a crime committed by a non-Indian on the reservation is for the tribal police to detain the offender and deliver him or her to the proper authorities.")[2]

### III.

Having concluded that Menzel had the authority to stop and detain Talks, this Court now turns to his claims that statements he made and evidence obtained from him should be suppressed on Fourth and Fifth Amendment grounds.

### A.

The Court sees no basis for suppressing any of the statements or evidence obtained under the exclusionary rule. Because Menzel's actions were not ultra vires, the statements and evidence were not the "poisonous fruit" of an improper search or seizure. Compare United States v. Medearis, 236 F.Supp.2d 977 (D.S.D. 2002). This, however, does not end the inquiry or mean, ipso facto, that the statements and evidence are admissible.

### B.

While accompanying Talks to his patrol car, Menzel asked Talks what was going on and if Talks knew where Bird Necklace was at. Talks seeks now to exclude his responses to these questions. Whether Talks' responses are suppressible or not turns on a number of factors, including whether he was in "custody" at the time and "interrogated" by Menzel and whether his statements were voluntary.

---

[2] If it is proper for tribal officers to stop and detain, in Indian country, a non-Indian offender until state authorities pick him up, a fortiori, then it is proper for state officers to stop and detain, on the reservation, an Indian offender until tribal authorities come get him. The offender, however, must not be detained for an unreasonably long period of time and notice to the proper authorities must be promptly given.

8

Although the record is not altogether clear on this point, it appears that Talks was in custody when Menzel questioned him. Talks had been stopped and was being held in accordance with Leaf's instructions. More importantly, Talks was not free to leave and moments after being questioned, he was handcuffed and placed in Menzel's patrol car.

It also appears that Talks was subject to interrogation, or at least its functional equivalent, for purposes of Miranda. The questions Menzel asked were reasonably likely to elicit an incriminating response from Talks and arguably did so. See Rhode Island v. Innis, 446 U.S. 291, 301 (1980).

Finally, the Court does not believe that the Government has sustained its burden of persuasion and proven, by a preponderance of the evidence, that Talks' statements were voluntary. United States v Lebrun, 363 F.3d 715, 724 (8th Cir. 2004) (en banc), cert. denied, 125 S.Ct. 1292 (2005). Menzel himself noted that Talks was unsteady on his feet and detected a strong odor of an alcoholic beverage coming from his breath. Leaf, who saw Talks a short time later, would not even interview Talks because he was intoxicated. These facts stand out on this sketchy record and raise serious doubts as to the voluntariness of Talks' statements.

## C.

Talks also contends that the Government should be prohibited from using as evidence, the iron bar or "jack" that Menzel took from the back seat of the blue Buick. Assuming that

Talks has standing to complain,³ his contention is without merit because the search and seizure of the vehicle was not "unreasonable" under the Fourth Amendment.

Menzel individually, or in tandem with Leaf, had reasonable suspicion and probable cause to believe that Talks had engaged in criminal activity. Terry, 400 F.3d at 581; United States v. Gonzales, 220 F.3d 922, 924-26 (8th Cir. 2000). In addition, Menzel legally discovered the iron bar in plain view just outside of Talks' residence. Menzel thus was authorized to seize the bar pursuant to the plain view doctrine, see Horton v. California, 496 U.S. 128, 136-37 (1990), and/or the so-called "automobile exception" to the warrant requirement, see United States v. Rowland, 341 F.3d 774, 784-85 (8th Cir.), cert. denied, 540 U.S. 1093 (2003).

### D.

Shortly after arriving at the tribal jail, Talks was administered a PBT which registered at blood alcohol level of .10. He argues that the PBT constituted an unlawful search and seizure under the Fourth Amendment because it was administered without a warrant. The Court disagrees.

A well recognized exception to the warrant requirement is a search made incident to a lawful arrest. See United States v. Edwards, 415 U.S. 800, 802-03 (1974). The Supreme Court has explained this exception as follows:

---

³Talks testified that he did not have title to the blue Buick, but was in the process of purchasing the vehicle from the owner. If Talks was the only person who drove or used the Buick, he would arguably have standing to make a Fourth Amendment challenge. The record, however, indicates that he did not have possession of the Buick a number of days before the search and seizure took place and therefore may not have had a "legitimate expectation of privacy" in the vehicle or its contents. See Rakas v. Illinois, 439 U.S. 128 (1978); see also Rawlings v. Kentucky, 448 U.S. 98 (1980).

10

> It is the fact of the lawful arrest which establishes the authority to search, and we hold in the case of a lawful custodial arrest a full search of the person is not only an exception to the warrant requirement of the Fourth Amendment, but is also a "reasonable" search under that Amendment.

United States v. Robinson, 414 U.S. 218, 235 (1973).

In the case at hand, Talks had been lawfully arrested when the PBT was administered. Although certain inspections of and intrusions into the body may still require a warrant and not be covered by the search incident to arrest exception, Edwards, 415 U.S. at 808, n. 9; Schmerber v. California, 384 U.S. 757, 772 (1966), requiring that Talks blow into a PBT was a limited intrusion that was not unreasonable so as to fall outside of this exception, see United States v. Reid, 929 F.2d 990, 994 (4th Cir. 1991); see also State v. Buchholz, 1999 SD 110, ¶¶ 11-24, 598 N.W.2d 899, 902-04.

E.

Lastly, Talks asserts that his statements to tribal criminal investigator Sonny Garreau, the day after his tribal arrest, should be suppressed. Before being interviewed, however, Talks was Mirandized, waived his rights and agreed to talk to Garreau. Talks had spent the night in jail and no suggestion is made that he was still under the influence of alcohol and therefore incapable of waiving his rights and providing voluntary statements when he met with Garreau. As such, the Court sees no basis for suppressing his statements to Garreau under either the Fourth or Fifth Amendments.

IV.

Based on the foregoing and in accordance with 28 U.S.C. §636(b)(1), it is hereby RECOMMENDED that Talks' Motion to Suppress, Docket No. 16, be granted in part and denied in part. To the extent that Talks seeks to suppress his January 3, 2005 statements

11

to Menzel, the Motion should be granted. In all other respects, the Motion should be denied.

Dated this 22nd day of April, 2005, at Pierre, South Dakota.

BY THE COURT:

/s/ Mark A. Moreno
**MARK A. MORENO**
**UNITED STATES MAGISTRATE JUDGE**

**ATTEST:**
**JOSEPH HAAS, CLERK**
**BY:** _Susan Ten_
    **Deputy**
**(SEAL)**

NOTICE

Failure to file written objections to the within and foregoing Report and Recommendations for Disposition within ten (10) days from the date of service shall bar an aggrieved party from attacking such Report and Recommendations before the assigned United States District Judge. See 28 U.S.C. § 636(b)(1) and Fed R. Civ. P. 72(b).